Case number 24-8003-8025 In Re Human Housing Henrietta Hyatt LLC Oral argument, 15 minutes per side. Mr. Gannett for the appellants. Yes, I'm reserving five minutes. If it may please the court. My name is Peter Gannett, and I'm the attorney representing the appellants, Clearview Eastern Fund, Mrs. Clemmons, and Mrs. Long. This is not a case where Clearview Eastern Fund was an unsuccessful bidder seeking to undo a sale, turn a profit. Instead, this case involves a subchapter 5 trustee selling substantially all debtors' assets without proving the buyers met the requirements of section 363M and without the trustee properly exercising her business judgment. Additionally, this is not a case where the trustee sold debtors' real estate as part of a confirmation process. The confirmation order is not being challenged in this appeal. Importantly, the plan does not give the trustee unbridled discretion to sell the real estate to anyone for any amount she chooses. The plan required that the trustee sell the real estate in a marketable manner. To this end, the trustee of sales contracts with Mr. Drake and Impulse required that she comply with section 363. Appellants seek reversal of the bankruptcy court sale orders based on de novo review because the orders failed to establish a prima facie case under section 363M. The elements are as follows. One, one who buys assets for value. Second, in good faith. And third, without notice of an adverse claim. You say that the plan says a bunch of different things, but one of the things it says is that the trustee shall in her sole discretion hire a broker, auctioneer, or other professional to sell off the real estate outlined in paragraph B, either individually or as a whole. It seems like a whole lot of discretion on the part of the trustee, and it's proposed in the confirmed plan that you're not appealing. Yes, so the discretion relates to who the trustee hires, and we don't object to that. If you look at, there is sole discretion related to who she hires, and then it goes on and it says in whole or in part, and I'm not even sure if she has discretion on that or not. Clearly, where she has full discretion is who she hires, and we're not challenging who she hires. I mean, if you hire an auctioneer, you're going to have an auction. If you hire a broker, you're not going to have an auction. Doesn't that imply that sort of discretion as to the method? It's true, but the thing is this. To the extent that the plan gave her unlimited discretion, she gave up some of that when she selected section 363. So section 363, she had to comply with that. The contracts say she's going to get an order under section 363, and as a fiduciary of the estate, she should be maximizing the assets for the estate. So even if she has complete discretion to hire somebody, it doesn't say that she can just sell them for any amount. If she were running a business, she would have a fiduciary duty to maximize the assets for the business. So just because they have that clause in allowing her to sell it with anyone doesn't take away from the fact she's got to comply with section 363 because that's what the contract said. So you're saying that any time someone comes in at the last minute and says, we may have a better price, we may have a better offer, then that automatically triggers a lack of good faith on behalf of the buyer that's proposed?  What I say is that she should have known what those assets were worth. She should have gotten an appraisal or have some idea as to value. So it doesn't matter that your clients proposed that it be sold for $700,000 during the case and contended that that would have been an adequate price? I think what they tried to do under the plan was $975,000. I know, but that was what was negotiated after their objections to the sale that they proposed for $700,000. So they proposed a sale for $850,000. But the problem is this. They already had contracts with the trustee. So once the trustee signed the contracts with Clearview, it said in the contracts they had an obligation to go forward with the 363 motion. And that never happened. So it's not a situation where anybody can just come in. But in this case, it was kind of a rush. So if the trustee could have said, look, I have an appraisal that says this is reasonable, or let's have an auction between these two parties, or if Clearview was willing to pay the $850,000, maybe somebody else was. When you look at the actual sales compared to the scheduled claims, the sales were substantially less than the scheduled amount. So that should have raised a red flag that it wasn't a reasonable figure. She still had a duty to maximize the value for the estate. Also, she had a duty to advise the court of this adverse interest held by Clearview, which never happened. Clearview's attorney said, we have a signed contract. Contingent contract. Contingent on a lot of things. Well, they had to have the funding. That's a pretty big contingency. Right. But they had to have the funding at the closing. So what happened was they had a contract that never required that they actually advise in advance that they had the money, which maybe is a little unusual. And they had a contract that said they didn't have to have the money until the closing. But then the trustee got nervous they weren't going to get the funding and sent an email saying you have three days to get $850,000 in a certified check. Well, that just wasn't reasonable. That was unfair to my clients. Plus, my clients had separate contracts. So they should have been able to perform one or two of them. Whereas when you talk about the impulse, they tied all the properties together. So some of those contracts were less than 75% of what the schedule values were. The problem we have is the trustee didn't have any basis for saying that the sales to impulse were reasonable or for value. And she should have done that by looking at the schedules at least and determined that at a minimum you've got to be within 10% or 20% of the scheduled amount. Well, how about being within 20% of the confirmed plan amount that was going to sell to DeVelco? The actual sale price was close to 85% of what the plan called for. Well, you mean the $975,000? Right. The problem was if you look on a parcel by parcel basis, it fell short. The Shelbyville property sold to Mr. Drake was sold for less than 50% of the scheduled value. It was scheduled for $180,000 and was sold for $80,000. That's just not a fiduciary... Should we just undo that one sale? No, because the other sales are too low too. And it was this contract. My clients had contracts. They had an adverse interest in the property, a claim, an adverse claim. The definition of claim is what's used in the definitional section of the code. And a claim can be disputed. So the trustee had the burden to come forward and tell the court, hey, we have this disputed claim. We signed contracts with them. We think they're canceled. But the court's got to adjudicate that as part of the 363 process. Because when they knew they had that, in fact, my clients kept trying to say, judge, we have signed contracts. And then they submitted that affidavit later that day showing the contracts they had. There was no contingency in that contract that wasn't fulfilled by my clients. The email from trustee's attorney says, it looks like we're ready to close now. The only thing that has to get done is you have three days to put the money in, get a certified check for the money. The other problem we have is a lack of marketing. Were you going to say something? I'm sorry. May I just ask a question? It's one that's somewhat troubled me since I first reviewed the briefs in this appeal. And that relates to the objections that were raised at the trial court level. First, at the expedited sale hearing. And thereafter, I think it was 23 days later when the hearing was adjourned. I'm trying to gain a better understanding of precisely what objections were raised to the trial court. Because it's my understanding that the appellants, none of them filed a written objection to the sale motion prior to the expedited hearing. That's understandable. That happens. A shortened time frame, it's compressed. And so that's excusable. But I'm wondering, there was no written objection notwithstanding the adjournment for 23 days. So what precisely are the objections that were presented to the trial court? And where in the record might we find those objections? First of all, the burden of proof is on the trustee. They've got to make the element. That's not my question, Mr. Gannett. I understand. Mr. Gannett, please just answer the question. Sure. Where in the record are the objections that have been raised by the appellants at the trial court level? The objections were at the hearings. Okay. Where? So in my brief, at page 16, I quote, the court says, what standings does that give Clearview in this case? And Clearview's lawyer says, back in August, Clearview and the trustee had entered into an agreement for Clearview's purchase of these properties, and I think that confers standing on Clearview to, in essence, try to obtain the benefit of the bargain. Okay. So Clearview is making an argument that it has standing? Yes. Okay. So that gives it the gateway to make objections. What are those objections that were made? So the objection was that it was too low. So part of the problem we had was in that first hearing. So it's a business judgment objection. It's that the trustee is not exercising valid business judgment in selecting the purchaser? Well, that was part of it. Nat's best judgment in not marketing it properly. They only marketed the $80,000 property for one week. Okay. Where in the record, though? Tell me, because all we're working off of as the appeals court is the record from below, and I am having a hard time determining exactly what the objections are from the transcripts. So walk me through and direct me precisely to what objections were raised in the transcripts. And I'm particularly looking at the transcripts that are dated November 6, 2023, and then the adjourned hearing November 29. So I misspoke earlier. Not 23 days, 26 days to file a written objection that was never filed. So how is it that the trial court committed an error, and what are the objections that the trial court overlooked? And tell me those objections from the transcript, if you can. Sure. So in the first hearing, Clarice Clemens, who's the owner of the property and also a creditor, said she wanted to talk. And Judge Stout said, we're not going to let her talk. I want them to come at the next hearing. So the next hearing, Tanae Williams came up from Florida ready to testify. We want to put on the evidence of this. And the court wouldn't do it. And so then, at the next hearing, the January hearing. Yes, but what were the objections? Why could the sale to the proposed purchasers, being Impulse and Colin Drake, not be approved by the court? Where in the record are the objections? Because we have this after-the-fact revisit to 363M. Now, 363M is cited in all of the sale motions. Yet I never heard any of the appellants raise an objection to 363M at either the initial sale hearing or the adjourned sale hearing. So why is it that we're revisiting that today? Well, first of all, admittedly, when they canceled the contract, my clients didn't have a lawyer. So they scrambled to find a lawyer. And at that first hearing, when the lawyer read out the proposal, it was the wrong proposal. And that is shown by the declaration filed by Tanae Williams in January. So they tried to get an evidentiary hearing. And when they didn't get an evidentiary hearing, they submitted an affidavit. And the Bingham case says that's an appropriate way to handle that if you don't have an evidentiary hearing. But what were the objections during the hearings? And I'm sorry to belabor the question, but I'm not sure that I'm getting the answer. Tell me what exactly the objections were from the appellants at the trial court level from the transcripts. Can you identify what they are beyond business judgment, failure to market, inadequate sale price? That's fine. That would seem to be a business judgment objection? Yes. Okay. So we have a business judgment objection. Do we have any other objections that the appellants raised during the two sale hearings? They objected because they said the price was too low. Okay, business judgment. Well, not business judgment, because at some point it's too low to get approved. The case, the Maiden Detroit case, talks about a 75% threshold. So the bottom line is the court's got to find that it's fair and reasonable price. And the court couldn't find that by what they were presented. There was nothing in the motion and nothing in the order about the value of those properties. And impulse was the only thing that gave a value at $125,000 more. They also wanted to have a chance to have their contracts reviewed. The contracts that they signed before, they signed the contracts with impulse. So that goes to adverse claim. They have an adverse claim, and they said it was too low because we're willing to offer more money. And that's in the transcript. Yes, that's the implication of what they were saying. That's in the transcript expressly. Okay, so the trial court was apprised of the objection that was being made by the appellants at the time. They knew that we had a contract. And what the judge said was, well, this is a confirmation, this is pursuant to a confirmation, and didn't let them further explain the nature of those contracts. So that's why they submit an affidavit from Ms. Williams explaining, we have this contract that should be enforced for more money. Okay, well, one last point, and that returns to this notion of having a firm commitment, the apples to apples, apples to oranges judgment of the trustee in the case. At the initial hearing, the argument was made by one of your clients, the appellants, that the fair thing to do is to have a stalking horse. But counsel for Clearview then concedes later in that same hearing, quote, I've shown it to Attorney Stasberg. It is not a firm commitment. I have to acknowledge that, close quote. The conclusion of the hearing, the court specifically directs Clearview and probably the other appellants, quote, and I would expect, Ms. Russell, for your commitment to be firmed up by then, meaning at the adjourned hearing on the 29th of November. During that hearing, once again, Clearview has nonbinding commitment letters and term sheets with total net proceeds of only $434,000 after factoring in the construction holdback. And all of this is in the transcript. And the court specifically asked to Ms. Russell, counsel for Clearview, has Mr. Stasberg misrepresented anything that's contained in that communication? Ms. Russell responds, no, sir. I have been unable to produce an unconditional letter or a letter of credit or anything without conditions. So why is it that the trustees' business judgment doesn't carry the day here in connection with the sale process? So first of all, in response to that, if you look at the declaration of Ms. Williams, she explains that the proposal that was given to trustees' counsel by Ms. Russell was the wrong proposal. The declaration of Ms. Williams, was that before the trial court on November 29th? No. And she wanted to testify that day. And if Ms. Williams had testified, she could have clarified that that was the wrong document. They were reading from the wrong document. Yeah, Mr. Stasberg read it correctly. It was the wrong document. And she clarified that later with her affidavit, that we had a different document showing that the funding was there. The other thing is, the contracts with the trustee and Clearview didn't require them to have the money available until the closing. And because of not having a sale order, it was hard to get the funding. It was like a chicken and the egg. But they decided in the contracts they would have to the closing to come up with the money. Mr. Gannett, we're way over the time, but I wanted to allow all the questions to be answered. But we'll still give you the five minutes that you reserve for rebuttal. Okay, very good. Thank you, Jim. Is there anything more at this time? We'll hear from Apollina. Okay, very good. Thank you. Thank you. Good morning, Your Honors, and may it please the Court, Andrew Stasberg on behalf of the appealee Elizabeth Woodward, the subchapter five trustee for the debtor, and Ms. Woodward is present. I want to begin and emphasize a point. Mr. Gannett mentioned that he's not appealing the confirmation order. And that's correct, but that's a major problem here. It's a major problem for his arguments and his client's position. That confirmation order, which is a final unappealable order, has a race judicata effect. It gave my client the discretion to hire an auctioneer or a broker to sell the property in a marketable manner. And that's exactly what she did. There were no other guardrails or conditions like a minimum price, obtaining appraisals, hitting certain thresholds or metrics. No other guardrails or conditions existed under that plan. That can be contrasted with the sale to Delco where, for example, there was a $975,000 minimum price condition for that sale. And I want to mention something that's relevant here on the $975,000 to DeVelco. That also included a release of the personal guarantees that the principals of the debtor, Ms. Long and Ms. Clemens, had associated with that loan obligation. So that $975,000, when Your Honor mentioned the roughly 85% difference between the ultimate sale price of the portfolio, that $975,000 also included a release of those guarantors. So I want to mention that as well. So the race judicata effect addresses all of the issues about the trustee's ability to sell and her business judgment because all of that was done under a plan. What we're really here about is good faith. Because yes, admittedly, the trustee sold these properties under 363B and sought and obtained a finding under 363M to obtain good faith purchase. So that's why we're here. And the problem is, as Judge Gregg alluded to, is the issue of good faith was never raised at the lower court. It wasn't raised in an objection. In fact, there were no objections to the sale motion. And at the last minute opposition on November 29th at the hearing, all of the presentation by Ms. Russell, counsel for Clearview, was about my client has a better offer, my client should be able to bid. They were all of that nature. There was never any sort of opposition against the two good faith purchasers, Impulse and Drake, which is not surprising. Because in fact, they were not insiders. They negotiated with our broker. They entered into a standard residential real estate contract. And they paid value for the properties. So it's not surprising that no type of objection or otherwise opposition in court were raised as to the purchasers, the nature of their good faith status. So what we're left with is the race judicata takes care of the sale. It takes care of the business judgment issues. And we're getting into good faith arguments, which are just now being raised for the first time. Now... Let me ask a question. You focused on the race judicata effect of the plan, but you also made reference to what I guess would be more of a waiver argument with regard to the good faith aspect of 363M or the more general concept of mootness. Are those alternative approaches from your standpoint, or are they tied together? In other words, if you were arguing for how this court should rule, would you focus on purely the race judicata effect, or do you have to couple that with the good faith aspect since the trustee came back into court essentially asking for that finding? I think it's a coupling. I think the 363 sale motions complement the confirmation orders. My client was directed and authorized under the plan to sell the properties in a marketable manner. So from the business judgment, the sale, the value, those are all addressed by the plan. The plan does not address the good faith. Not directly. I do want to mention that the plan under 1129, I think it's 8-3, has a requirement plans are confirmed under good faith and don't violate any code section. But that aside, good faith 363M is not specifically addressed in the plan. So we had to address that through the November processes. I believe we've done that again. We used a broker. We comported with the plan. They were not insiders. There were no objections to the status of these non-insider parties. So I think it's addressed. Hopefully I'm answering your question. But they are. 363M is a separate issue from race judicata in the plan. With 363M, we don't have a stay. In fact, the appellants tried to obtain a stay in lower court. We had a hearing on that. And once again, the court denied the appellant's request for a stay. So we're here today with an order that allowed for the sales to proceed. They did, in fact, close. And I don't know what relief this court could fashion. I hope I don't get struck by lightning. But I don't know how the court would undo the sales at that point in light of 360M and the applicable case law that interprets 363M. And then on top of that statutory mootness, we have equitable mootness as well. Again, we have a substantially consummated plan. I believe Mr. Gannett pushed back on confirmation. But I think we meet the test on that. The properties have all been sold under the plan. The trustee took control as a successor of the debtor of the estate. And distributions in the case have begun. We made distributions to professional. And those, I believe, are the three benchmarks for equitable mootness. So we have statutory mootness and equitable mootness as well that deals with the appeal. I want to mention as well that under the plan, just in terms of fairness, the two appellants, the principals of the debtors, Long and Clemens, they had months to try to buy this property under the plan. And there were a number of orders that were entered that extended the deadline of the original plan. The trustee, and I believe TURAC as well, to an extent, TURAC is the secured lender, were helping, trying to help these principals through DEVELCO get this done. And that's reflected through these extensions. And it just didn't happen because they couldn't come up with the money. Which leads back to the decision to terminate contracts with the Clearview entity. The same thing, Clearview never could get the money. And part of the troubling aspect of Clearview's situation is when Duke, performing diligence about the Clearview offer, Ms. Russell, who by the way, pardon me as an aside, Clearview had counsel beginning with Ms. Russell throughout the November hearings and predating the November hearings. Now Long and Clemens, they did not have individual counsel. But Clearview did throughout the whole contract situation when their contract was terminated. And I dealt with Ms. Russell directly, that's reflected in the November transcripts. And on the eve of the November 29th hearing, the day before, Ms. Russell emailed me everything she had regarding the funding. And I get those documents. And lo and behold, the funding documents reflect that the loans aren't for Clearview, but they're for an entity that's owned or affiliated by one of the debtors, insiders, Ms. Clemens. And that on top of the conditional nature of the funding was troubling because that wasn't disclosed. And insiders, while insiders can certainly be 363 purchasers, they have a higher level of scrutiny. And particularly in this case where the insiders, after many, many months, couldn't pull it together and buy and come up with the funding to make the DeVelco purchase. Let me ask you one question about Clearview. Why does Clearview have standing to object to the professional fees? Or your position I guess is that they don't. I haven't thought that through. Why would they be a person aggrieved? I don't have an answer to that. They put down a deposit which has not been funded to them under the- My question is why would they be harmed in any way by the payment of the brokerage, or the fees for the- I don't think they would. To the extent Clearview has a claim, they should file something with the court. They should have- Well, let me back up. They should have filed something with the court. They should have filed an objection because now Clearview is up against it in light of these unstayed orders which make it abundantly clear that the properties are being sold free and clear of all interest and claims. That would include any purported claim that Clearview has. They should have stepped up and raised an objection if they had an issue with the contract termination. It's quite telling that their attorney did not raise that objection because from where I'm sitting, they don't have a case. Again, it's telling that that's not their record. There's now a court order, again, that says those properties were sold free and clear of claims. For Clearview to come in now and say, hey, I have a claim, I have a claim, tough. I've got an order that's unstayed that says otherwise. Moreover, why didn't you raise it at the November 29th hearing? To your honest point, I don't know why they would be aggrieved on the professional fees. I'm just going through my notes. Your Honor, Judge Gregg, again, had just mentioned the November 29th hearing, what transpired and read through the transcripts. Again, the court allowed Ms. Russell to speak on behalf of Clearview. It was very apparent that based on her representation that Clearview didn't have a leg to stand on. They didn't have money. We had contracts with Impulse and Drake. We were not in an auction format. If the appellants won in an auction format, they should have objected two years ago and put that in the plan. Instead, the plan, again, gave Ms. Woodward the discretion, sole discretion, to hire an auctioneer or a broker to sell a property in a marketable manner. She did just that. She complied with the plan. Are there any questions for Your Honors? I guess I have a question on good faith. I understand that a component can be value, but to what extent is a third-party purchaser not acting in good faith when they make an offer, it's accepted, and they complete the sale? What standard would apply here to render their actions? It's the buyer whose good faith is an issue here, at least according to appellants. What standard do you think should apply? The cases I'm familiar with come back to good faith. It's dealing with collusion and fraud or some type of unfairness. I guess for the first time in the appellant setting, we hear these first-time arguments about unfairness. But the unfairness that's being articulated all relates back to, and I'm condensing the arguments, but they all relate back to the appellants don't like how the sale process went. My response is tough. I guess my question is why is it buyers' good faith versus the sale process? I'm trying to figure out, and maybe I'm just leading up to rebuttal here, but my question is how is a lack of good faith on the part of the buyer? No, the buyer is not an insider. They showed up. They signed a contract. They fulfilled their obligation under the contract by paying the money. Good night and God bless. It's kind of like trying to disprove a negative. That's the best answer I can give for your honor. I think your time is up, but we gave Mr. Gannett a little extra time. Are there any final points you want to make before you end? No, it's frustrating to condense everything. There's a lot of information in the briefs, and I would just close by emphasizing saying that this case has the extra layer of a final order in the form of a confirmed plan that authorized my client in its sole discretion to sell these properties in a marketable manner. So all of these business judgment and sale process arguments are an attack on that plan and shouldn't be considered. The limited arguments here involve good faith, and those weren't raised in the lower court, and what's being raised by now I think have been defeated on a variety of grounds. Thank you. Thank you. There's a couple of things I want to address. First of all, on this waiver argument. So as the court correctly identified, there was no way in that one week between the initial hearing that they could file the written objection. They did file a motion to reconsider document 210 on December 7, 2023, and that also had an affidavit of Ms. Williams explaining that they read the wrong proposal into the record and that they should again have the opportunity to close their contracts. Also, the court wanted to use the $975,000 figure as perhaps that's what the fair market value was, but that was a negotiated settlement figure. That doesn't mean that you could use that as the base because presumably it wasn't the fair market value. So you have to have something to tether this to. We can't just rely on the buyers saying, oh, I think it's fair. The movement, in this case the trustee, has got the duty to try to figure out what is fair so we have some benchmark. Let me ask you this. A good faith requirement relates to the buyer. Nearly everything you've said relates to the trustee. In other words, you've argued that the trustee should have used a different process, the trustee should have gotten a better price, but what does that have to do with good faith when the good faith requirement is not about the seller, it's about the buyer? Well, the buyer didn't put any evidence in to support its position of good faith. The only evidence came from the trustee. But part of the reason there wasn't an actual evidentiary hearing was because there was no actual objection that would require a hearing. In other words, are you saying that even in an uncontested hearing that the court is required nevertheless to have an evidentiary hearing when no one is actually contesting good faith, which is the case here, it appears?  What I am saying is it's like the summary judgment process. If someone files a summary judgment motion and doesn't meet the initial threshold, the court can deny the motion even without a response. The same thing is here. The court order didn't touch on the three elements of 363, good faith, for value, no adverse claims. If that had been in a motion, maybe it was an affidavit, then that might have been all right. But once parties came in and said, look, we have an adverse claim, we are willing to pay more, then the court should have held an evidentiary hearing or at least said, look, I need some affidavits, I need the motion bolstered, because it's a million dollars. Obviously, it's a sliding scale. If what we are selling is some old car, then the amount of work that the court would have to do would be much less. Maybe the NADA, but there was nothing in the motion that the court could have seized upon to enter the order. I want to touch briefly on the standing issue. Mrs. Clemens and Mrs. Long have standing as their accreditors of debtors based on the guarantee of its debt to the secure creditor. The other thing is, under the Lexmark case, the personal grief test is no longer good law. The Sixth Circuit in Litton Loan explained that Lexmark terminated the personal grief test in bankruptcy appeals. Under Lexmark, standing exists so long as a party suffered an injury in fact fairly traceable to the defendant's conduct and likely redressable by favorable decision. Additionally, in Litton Loan, they pointed out that the personal grief language has been removed from Section 158. Our position is the personal grief test is not valid. But even if it is valid, we still make that test. The trustee has never returned Clearview's $8,500 earnest money, and the Stark case says that if it's an improper sale process, that is sufficient to get standing. Statutory mootness doesn't apply under Section 363, MOAC mall, recent Supreme Court case. It's only moot if it's impossible for a court to grant any effective relief whatsoever. Equitable mootness doesn't apply under the confirmation order. The trustee's brief in note 22 and page 39 says, raised studicata relates to the confirmation order, but once the trustee decided to use 363 to get those protections, they have to comply with that, and they agree that 363 is not moot, because that's the whole basis for this. I believe your time is up. Thank you. Thank you. All right. We will take the matter under advisement, and a written opinion will be issued in due course.